Before we begin, let me simply say that this is Judge Koubranis from New Haven, Connecticut, accompanied by Judge Wesley, upstate New York, and Judge Nardini, also in New Haven. We will proceed in a very simple fashion. I will afford each counsel all of the time indicated on the day calendar, and after they have completed each segment of their arguments, I will turn to my colleagues and ask whether they have any questions for the advocate. So having said that, let's begin with counsel for the appellant. Thank you, Judge Koubranis. My point today is that denial of comedy abstention was error because there is a true conflict between Chinese and U.S. law. We absolutely believe this court should defer to Moffcott, but the degree of deference in this case should not matter in the end. The applicable Chinese regulations unambiguously required price fixing in violation of U.S. law. That's not just our view. It's the position taken by the United States, Europe, Mexico, and China in the WTO raw materials proceedings. That position was endorsed by the WTO panel itself and confirmed in U.S. litigation by the District of New Jersey. The district judge in this case is the only one to rule otherwise, and that was done by critical terms such as industry self-discipline. There's no dispute here that China's 1997 regulation required price fixing, but plaintiffs say that requirement was eliminated by the 2002 notice. The 2002 notice did no such thing. It specifically said the opposite, that the chamber was obligated, quote, to coordinate export price and industry self-discipline. That's page 301 of the special appendix. Vitamin C was subject to price review by the chamber and customs, and the chamber was directed to make active efforts to avoid anti-dumping sanctions and promote industry self-discipline. Even the plaintiffs here admit in their brief at page 25 that the new system required the subcommittee to actively coordinate to set vitamin C export prices and quantities. The 2002 notice was preceded by price wars viewed as very damaging by Chinese authorities. That was why the notice specifically directed the chamber members to strengthen communication and cooperation among themselves. That's also at page 301 of the special appendix. This regulation was plainly designed to enhance price fixing, not to abandon it. Now one of the key terms that China used repeatedly was industry self-discipline. Every source agrees that this term means price fixing. That was the uncontradicted evidence from our expert, Professor Chen. It's supported by the scholarly articles we cite in our letter brief, and it's supported by every submission in the WTO proceedings. The court below ignored all this, refusing in a footnote to acknowledge the point in light of what he perceived as evidence of cheating and weak enforcement, which I'll get to later. Plaintiffs repeatedly say that prices were set by the enterprises with that government intervention. But that was just what China itself was directly compelling. As this court put it in its opinion, China chose a decentralized means by which the ministry, through the chamber, regulated the export of vitamin C by deferring to the manufacturers. Nothing in the Supreme Court's opinion is in any way inconsistent with that determination. And China's regime was not so unusual. Our own Export Trading and Web Pomerance Acts also authorized U.S. companies to fix export prices without government intervention. And a similar regime was upheld against an antitrust challenge by virtue of the State Action Doctrine back in 1943 in Parker v. Brown. Plaintiffs here make much of the jury's finding of voluntarians. But that finding was meaningless. The jury was not even allowed to see China's regulations or to hear explanatory testimony about them, and was told simply that defendants had to prove that individuals in the Chinese government, not Chinese law, compelled the conduct. The cheating plaintiff's side has never been a defense to a price-fixing charge. And the lax enforcement argument fares no better. As this court said in its opinion, quote, inquiring into whether the Chinese government actually enforced the PDC regime as applied to vitamin C exports confuses the question of what Chinese law required with whether the vitamin C regulations were enforced. The court added that this evidence was not even relevant to the PDC regime's legal mandate. That's at page 192 of 837S3. And the court was correct. The comedy issue in Hartford Fire is whether the laws conflict, not how effectively they were enforced. As this court again said, by directing vitamin C manufacturers to coordinate export prices and quantities, and adopting those standards into the regulatory regime, the Chinese government required defendants to violate the Sherman. Now plaintiffs' other arguments fare no better. They say that because participation in the subcommittee was nominally voluntary, that meant that price-fixing was not actually required. But there was no evidence that any of the four original companies who became council members under the 2002 regime, no evidence that they could resign. And non-members were bound by the industry-negotiated fixed prices in any event. That's at page 3916 of the joint appendix. Saying that everyone could resign would render the entire regime a null. And this court confirmed that the interpretation put forth by the district court and the plaintiffs here was quote-unquote nonsensical. Now plaintiffs also argued that the evidence of charging more than agreed minimum prices meant that price-fixing was not required. That's just wrong. Charging more than the agreed-upon minimum price is still price-fixing. And again, this court specifically rejected that argument. Your Honor, I've saved the rest of my time for rebuttal, and thank you for entertaining my argument. Thank you very much. Judge Branis, outside of my allotted time, I'd like to express the condolences of all the counsel in the case for the untimely demise and departure of Judge Hall. Many of us have argued before him repeatedly, and it's truly a sad loss for the court. Thank you very much. We're very grateful for that joint expression. We'll hear from Mr. Carter Phillips. Good afternoon, Your Honors, and may it please the court, I represent the Ministry of Commerce of China in support of the defendant appellants. I'd like to begin, frankly, the way I began the last oral argument in this case before the court, which is by expressing the deep appreciation of the Ministry of Commerce and the Chinese government to this court for allowing the Ministry to file briefs in support of the position of the defendants and for allowing me the opportunity to present oral argument before you. On the merits of the case, I fundamentally and the Ministry fundamentally agrees with the position of the defendants that any straightforward reading of the 2002 notice and the 2003 notices and the subsequent behavior of the Ministry would demonstrate that, in fact, what we're talking about in this context is mandatory price fixing by exporters of vitamin C and, candidly, a host of other commodities, and that as a consequence of that, the court should dismiss the complaint. But if the court had doubts about whether or not the 2002 notice should be read that way, then the question becomes one of deference, and while the Supreme Court clearly ruled out the possibility of conclusive deference paid to the views of the Chinese government, it nevertheless was quite clear in saying that all foreign states are entitled to substantial deference in the positions that they put forward, and you have to look at them in context and make sure that, in that setting, that the position taken by the government is persuasive. I won't try to go through all of the factors, but it does seem to me that the most salient ones clearly favor deference in this case. There's no question that the Ministry of Commerce is the highest authority within the Chinese government. There's no question that it has placed its view in as clear a fashion as it can as to what it believes was required by exporters of vitamin C under these circumstances. I believe that it has taken into account all of the available legal materials that have been put, that we either presented in our own right or responded to the plaintiffs in their approach to the case and tried to explain that. The transparency of the Chinese system is obviously a matter of debate, but it does seem to me, at least with respect to the materials that are before the court, that they are written and can be interpreted and should be interpreted consistent with the way that they are understood by a Chinese audience. And finally, and the only point that the court, the Supreme Court, made in vacating the earlier ruling by this panel, is the consistency in there. The only issue that the Supreme Court identified was the statement made by the Chinese government to the WTO, in which it expressed the view that there was no longer regulation of exports after 2002. But in context, it's absolutely clear that what that meant is that they had eliminated the licensing and quota system and replaced it with the price verification and top system, which by its very terms required additional collaboration among the entities, reaching an agreement and then an agreement that must be abided by by all of the participants who wish to export vitamin C. Therefore, there is no inconsistency in any position that's been taken. At the end of the day, it seems to me it would be extraordinarily strange for this court to reject the position of the Ministry of Commerce on its understanding of a rule that it adopted itself and has interpreted consistently now for more than a decade, actually, in litigation with in various contexts. It would be even more strange to do so and reject the conclusion which was adopted by the WTO that said throughout this period that China required exporting enterprises to export at set or coordinated export prices or otherwise face penalties. It seems to me that's the right way to interpret the regime that was in place during 2002 to 2006. The court recognizes that the court should reverse the decision of the judgment of the district court in order this complaint set aside. I have nothing further. Your Honor. Thank you, Mr. Phillips. Mr. Jacobson has reserved three minutes for rebuttal, which, of course, would be after we have heard from Mr. Gottlieb. But before turning to Mr. Gottlieb, let me ask each of my colleagues on the bench if they have any questions. I'll begin with Judge Wesley. Thank you, Judge Cabranes. I have a question for Mr. Phillips, and I don't mean to exclude you, Mr. Jacobson. If you want to comment after his answer, perhaps you can help me. Mr. Phillips, you ended with your mentioning of a WTO document that ended up being cited by Judge Kogan in his decision, more specifically, Special Appendix H-49, which relates to China's accession to the World Trade Organization and non-discrimination with regard to its economic policies. And this document seemed to turn the tide in some ways for Judge Kogan. Let me ask you, help me a little bit, if you can, because the briefs don't give me a reference point. The WTO was primarily concerned with prior relationships, and it seems that China was itself also, in which China may have controlled the actual price, the prior system, of the automatic export controls, in such that if there were controls over price, there could be anti-dumping concerns in the WTO. Is that correct? That is correct, Judge Wesley. So the fundamental concern, or the fundamental shift, was that in the period of time up until 2002, the Chinese government operated what you might call a command and control economy, where a very limited number of participants, and what they did was very strictly regulated directly by customs and the Chinese government. There was an effort to make a transition to a more market-based economy, but it was a transition that had to be done carefully, particularly for unusually important commodities, and vitamin C is one of those. And that's what explains the transition. They had given up this very strict regime, but that didn't mean that they had completely abandoned all regulation of exports. That's what I want, because obviously your position here is that there is compulsion here, there is compulsion to fix the price, and that there's a mechanism for enforcement, and that's the CHOP, right? Yes, Your Honor. And beyond that, you can't export without the CHOP, and if you do, in fact, try to export without the CHOP, you're subject to severe penalties. Okay, okay. So I'll ask you a question or two about that, maybe, if we get that far, but this is, for me, where the rubber meets the road. It's not every day that I get a case involving the World Trade Organization, Mr. Phillips. We get a lot of unusual stuff, but we don't get stuff involving this type of stuff, and so I'm trying to figure out the lay of the land here a little bit. Now, are the concerns in the context, and again, I realize this is a little just off step, but it helps me understand the context. Would it be fair to characterize the system that now exists, that you presented to us as administration of price by surrogate? In other words, that the industry sets the price for the four members of a charter, the committee set the price, but that there is some review or ability to control or at least interdict or there's some kind of check that exists within the ministry. Is that the view of your client? Yes, the basic delegation was made, in the first instance, to the Chamber of Commerce, which is not like our U.S. Chamber of Commerce, which I know all too well. Well, I know. And that they would then provide the mechanism by which the industry participants could reach agreement and then come to a price that would be as fair as it can be, recognizing that different producers obviously stand in somewhat different economic positions, but would also ensure, and this was the absolutely critical part of this, would be to ensure that the Chinese government would not be susceptible to claims of dumping by allowing vitamin C prices to fall below what the WTO might regard as dumping in a particular context. Okay, okay. Now, that puts a much better context on. Judge Kogan, I think, there's a problem, I think, with his understanding of situations in which perhaps there wasn't enforcement. And you make the point that the lack of enforcement doesn't negate or disprove the existence of the compulsion. It's just that there may not have been enforcement in a particular instance, but that doesn't disprove the existence of the law or the legal structure upon which compulsion is predicated. Is that correct? That is absolutely correct, Your Honor. And candidly, that would be just as true if we were talking about the United States. I'm quite certain that there are lots of instances of price fixing that go on that we don't enforce. I don't think anybody would seriously argue the United States doesn't have prohibition on that. I think of it a little bit more locally. I drive back from Chambers to my home, and there's a 30-mile speed limit, and I get pulled over. I may not get a ticket, but that doesn't mean that it's not a 30-mile-an-hour speed limit. That's how I explained this to my law clerk today. Okay, so now let me ask you one or two other things, then I'll leave you alone, and I'll be done with my questions. Where in the record can you show me, or let me make it more preliminary. Is there a provision in Chinese law that deals with a default where the committee either sets a price or, excuse me, doesn't set a price or sets a price so low that could be seen as being a dumping price? Is there some check? If there is, where can I find that in writing in the submissions that we have? I don't think there's anything specific that identifies that, although Mr. Jacobson may have something he knows the record somewhat better than I do, but I believe it is embedded in the concept of industry self-discipline and where the Chamber's obligation is to protect the Chinese government's interest in avoiding anti-dumping, that the understanding is that the price that will be set will promote the government's overall interest in international trade and then try to do that in the context of as fair a system as can be achieved among the various participants. And so it is candidly a culturally different approach, which is to say we have confidence that the private actors regulated by the quasi-governmental actors ultimately responsible to the Chinese government will in fact adopt prices that will be the same prices and more fundamentally will protect the Chinese interests. I'll switch to Mr. Gottlieb in a second, but I don't mean to—I'm not trying to harass you, I just want to follow up on that for a second. No, no, that's quite all right. You're not certain that it's in the record. Whose burden was it to make sure that it was? All right. Your Honor, it's Mr. Jacobson. May I address that to Judge Wesley? So the regulations consistently and repeatedly state that they want to avoid dumping allegations. There is nothing more specific than that other than the agreement which everyone acknowledges to fix a minimum price at $3.35 per kilogram. So that's all there is. There is nothing more specific than that. And I think both sides carried their burden to the extent there is one on it. I did want to address the WTO argument. So the fundamental change in 2002 was the elimination of non-discretionary licensing and export quotas. And the result of that was that not just the four original manufacturers were allowed to 11 other companies, some smaller manufacturers and some export trading companies to manufacture. That was what constituted the abandonment of export administration. There was no understanding that China gave up price coordination or industrial self-discipline, all of which are cited constantly in the 2002-2003 regulations. And everyone in the WTO proceeding, everyone agreed that the giving up export administration had a limited meaning of the sort that I just gave you. Let me interrupt you just for a second, and it's not to try and pin you. Well, it's for you to try and help me out a little bit then. Can you tell me where in the record that was in that? I appreciate the explanation. And it may make some sense, and I need to chew on that. But can you tell me where that appears in the record? So there is no statement in the record that giving up export administration equals sign adds additional companies. It's reflected at page 3947 of the joint appendix, which lists the new members. And one has to draw the inference that I drew to reach that conclusion. But I think that inference is irresistible. Okay. The problem is we have to connect the dots here. Um, we took a view, Judge Cabranes and I, and Judge Hall with us at one point in time of what we were to do with regard to what a foreign sovereign told us with regard to its governing, its rules with regard to this particular economic situation. But we were then told that we had to look at other things, and that we were to employ Rule 44.1. And it's now, to some degree, it's an issue of law, but it also has a matter of proof to it. And my concern is that what am I supposed to do? How am I supposed to understand this and accept what you've just – I mean, that makes some sense to explaining – I mean, it may not make some sense after your opponent argues, but to the phrase that appears in this document at the WTO, this says, from January 2002, China gave up export administration of, among other things, vitamin C. That's the thing that got Judge Kogan going. Wait a second. For me personally, I need something to grab a hold of. And I'm asking you now, where am I going to find that handhold? So, I think the best place to look for that is in the WTO trade reviews of China's policy. And you can find those if you have our letter brief. Those provisions are cited at page nine of the letter brief. They're not – we cite internet sources for those trade reviews. I'm not sure whether they were in the district court record. We are handling the appeal. We were not at trial. But I think if you look at those transitional and trade policy reviews, you'll see that the abandonment of discretionary licensing and export quotas did not mean abandonment of price fixing. And in fact, I don't think you even have to go that far because the 2002 and 2003 documents are very clear on their face that price coordination was required and that industry self-discipline was the goal of China in this connection. Okay. Thank you very much, both of you. I've taken up a good deal of time and I appreciate the Senate chair's indulgence in that regard. Thank you, Judge Cabranes. Thank you. Judge Nardini. Thank you. Maybe I could start with Mr. Phillips because you're here on behalf of the Chinese government. If I could direct your attention to the factors that the Supreme Court instructed us to use when evaluating how substantial the difference ought to be when we get a statement of law from a foreign government, I could focus on two that at least right now I'm sort of thinking about. The one that I'm having a lot of trouble and I'll be interested in hearing what plaintiffs have to say about this too. This is a question really that's going to go to both sides, is transparency. And let me just lay out why I'm puzzled and I'd be interested in hearing your views on how this plays out. It seems to be sort of a conundrum where the less transparent a government might be, the more helpful it would be to have the foreign government enlighten us. And I would be inclined to that reason, perhaps to give them more deference. On the other hand, the less transparent they are, the less I can check their homework and the more I might be suspicious of their motives because I'm just getting in its addictive. And at least in this circumstance, I confess that I find the materials that have been produced from China not nearly as illuminating as would be ideal. And this may be all there is and so be it. But my inclination here is that we're a little bit on the less transparent side. So could you just tell me, in your view, how does the transparency element play out here? And also just more generally in terms of is more transparency good for deference or bad for deference? Well, I would argue that it ought to support deference. And part of the reason why you would want to take that position is because you probably would want to encourage more foreign governments to come forward and provide at the highest level the most official statements that they have available to assist courts in deciding questions of foreign law. And so if you say that countries whose systems are less transparent are given no deference, then you give them no incentive to bring forth their views, which would mean that you create, obviously, greater possibilities of foreign relations in disarray where you've got courts interfering with what the executive branch might think would be the best way to approach a particular problem in dealing with a foreign government. Let's pause on that point just so I can play that out. I guess I'm not understanding how if you give less deference to a less transparent country because you're afraid of creating a disincentive to having the country come forward with a view, wouldn't that be the same incentive structure that would presumably apply to a more transparent government? So I'm not sure how the incentive structure plays into the transparency element. Well, I'm not sure why more transparency, I mean, if you have a more transparent government and therefore you, in theory, at least, are less deferential, at least it should be easier for the judiciary in the United States to figure out what the right answer is. And there's probably less of a need to hear from anyone else about what the foreign government's law is in a particular case. I mean, to be candid with you, Your Honor, it's a two-edged sword, and I think your question reflects that. You can make the argument in either direction in terms of transparency, which is why, at the end of the day, I don't think it makes a whole lot of difference. I think in this particular case, we have the materials that are available. They may not have been as clear as a court in the United States would have wanted them to be. I think it's fair to say that they were as clear as the Ministry of Commerce and the Chinese courts would have understood them to mean and needed to be, which is essentially the message, obviously, that I'm trying to convey to you today and have been for quite some time. No, and I appreciate this. This is more of a global question and perhaps would have been one that would have been ideally directed to the Supreme Court as to which way transparency is supposed to cut. So maybe if I could shift your attention to the factor that I think might have been the one you led with, which was the fact that this is coming from the Ministry of Commerce. And I certainly understand the representation we've gotten from the Chinese government that the Ministry, in this case, is the highest authority in China with the ability to speak to these particular trade policies. And the representation that under Chinese law, as I understand this, it's in your supplemental letter here, which is the, what is it called? The decree of the state council number 322, that the power to interpret rules belongs to the formulating organs of rule. So I get that principle under Chinese law. And I guess I'd ask you though, because the ministry has proffered this decree to us, it hasn't simply said, well, this is a matter of Chinese common law or whatever the equivalent  then it seems to me we have to look at the decree. And the decree goes on to say that interpretation of rules shall be proposed by the legislative affairs departments of the formulating organs with reference to the procedure for the examination of the draft rules. And they shall be promulgated after submission to an approval by the formulating organs. So at the risk of a terrible analogy, it sounds like it's got to be some sort of a notice and comments sort of a thing like the APA. And I'm not suggesting that I'm drawing that in the analogy, but it sounds like there's a process that makes an interpretation law in China. Is there anything in the record suggesting that the ministry's position that has been forward to us has gone through the procedures that they themselves have told us are a prerequisite for their interpretation actually being as binding as the regulations themselves? Well, the answer to your question is nothing that I have seen that speaks directly to that. But I don't want to go to war with the premise. But I think what that's talking about is more of an internal process. It's not the public notice and comment. I think it's more of a private give and take within the agency, which I'm sure candidly took place prior to the 2002 notice being released. But because there's not a public notice and comment, I can't go to the Chinese equivalent of the Federal Register and identify a place in which that process would have played out. And I'm talking more about the policy, the interpretation that they've offered in your briefs and their declarations and things. On the one hand, it seems to me that the ministry has told us we're the highest authority. We are granted the power to interpret our own rules under Chinese law. Therefore, our interpretations are entitled to a very high level of deference. On the other hand, the document that they have provided us in support of that suggests that it's not just going around talking about a rule that confers upon the ministry this authority, but it's going through a process, whatever this process may be, whether it's private or public notice and comment, whatever it is. And I guess that's my question is, is there anything in the record, and it sounds like the answer is no, indicating that the interpretations offered to us in the pleadings in fact, has gone through the Article 33 process, whatever that process may be. No, there is nothing. And if I mean, I can always obviously go back to the Ministry of Commerce and ask them to clarify what process preceded the 2002 notice. On the other hand, I'm not sure that the reference to factors that the Supreme Court identified to take into account in terms of deference, envision the going behind. I mean, all it talks about is the authority of the entity or official offering the statement. And I don't think anyone, certainly the plaintiffs have never challenged the authority of the Ministry of Commerce to issue the notice that was issued. There's no evidence that I know of that even casts remote doubt about it. The question is, what does the notice mean? What was it intended to mean? And that's the position for which the Ministry of Commerce has come forward. So I guess to me, that's the more relevant question is not, you know, I don't think anybody questions the 2002 notice. The question is, what does it mean? And the Ministry is entitled to deference. All right. Well, maybe if I could turn to your, well, it's not co-counselor, I suppose, Mr. Jacobson. If I could ask a more fundamental question, I think one of the merits here, which is what exactly do you mean when you say price fixing? And let me just explain. I've been confused on both parts of, by both parties, is the allegation, or is your contention that the Chinese government compelled every price at which the defendants sold their vitamin C, or is it just that they had the minimum price, which I think you said was $3.35 a kilogram? And I guess I was looking at the interrogatory, the interrogatory 13 response. So I saw that, and I was trying to figure out, then is the notion that the Chinese government compelled that as a minimum price, $3.35, to make sure that no one got into anti-dumping problems. But to the extent that any of the exporters sold at a higher price, that was a decision that they may have made singly or in coordination, but not with the compulsion of the Chinese government. And of course, I was thinking of the PVC review, which as I understand it, you would get your as long as you were over the minimum of $3.35. So if maybe you could just respond to that. And if I've gotten the facts wrong, if I'm understanding the system wrong, I would very much appreciate whatever clarification you could give. So there are a number of inquiries embedded in that. But to start with what the regulation required, the regulation did not require the $3.35. That was a part of what the chamber and its subcommittee ultimately agreed on as the minimum price. What the law required was coordination on prices by the members of the subcommittee. And that is price fixing under the law. The main Supreme Court cases are Saccone backing from 1940, particularly footnote 59, one of the most famous footnotes in law. The Trenton Potteries case from 1927, and the Plymouth Dealers case, which is probably the most close here. The Plymouth Dealers case, which is a Ninth Circuit decision, but is considered bedrock law, is one where the auto dealers didn't agree on the prices they would charge, but they agreed on a starting point. And the court said, and courts ever since have agreed that that is price fixing. So when I use the term price fixing, I'm using it in the very broad sense contemplated by the decisions under the Sherman Act. I do want to make one... Can I just break that down a little bit? Can you tell me, so is your view then that the Chinese government compelled both features, meaning they compelled both the fixing of a minimum, which is the only number I think that was monitored by the PVC system, but that they also compelled coordination of prices that were actually charged, you know, regardless of how high they might be above that minimum price or not? Is that, am I capturing your argument correctly? I'd put it a little bit differently. The requirement was to coordinate prices, and it was understood that one of the principal objectives of coordinating prices was avoiding dumping sanctions. And that is where the companies and the chamber ultimately sat and agreed on the 335 price, that that was a price that came out of the direction to coordinate prices. I do want, I suspect you're going to come back to this, but I do want to make my quick point about deference for what it's worth, which is that China in all of its submissions has described the system that's logical, coherent, and that works and that did work. But the plaintiffs, in contrast, have described the system that this court itself viewed as nonsensical. So why would you not defer to the sensible interpretation over the one that has already been determined to be nonsensical? That's my simple point. Well, then let me quick ask you, and I'll be short about this. In your view, what do you think the Supreme Court meant about the transparency element? Do you think in the Supreme Court's view, the more transparent a government, the more deference they get, or the less transparent, the less deference they get? My ability to cross-examine an X-ray Justice Ginsburg is not very good. And I agree fundamentally with Mr. Phillips. It can be argued both ways. It's a two-edged sword. Some of the edges may have more application in some contexts. In this case, I really do think it cuts both ways, because the provisions of the Chinese regulation are not familiar to the Western eye. You need someone to explain them, and no one is in a better position to do that than the Ministry. On the other hand, I get your point that a non-transparent system creates issues of trust. That's the plaintiff's argument. So I think in this case, on balance, it cuts in favor of deference. But I don't think the decision of this case should turn on that factor. I think it should turn on the fact that the regulations unambiguously required price fixing that would violate U.S. law. Okay. And thank you both for your questions. And again, thank you for the patience of my fellow analysts. This is Judge Cabranes. This is a question for Mr. Phillips, but I welcome, as did Judge Ressler, one of our colleagues, welcome Mr. Jacobson's adding whatever views he has. I guess it was Judge Ressler who mentioned it. So let me just turn to this question that both of my colleagues have touched on. I want to turn to the respectful consideration by the U.S. court to the views of China on the character of China's own law. It appears, if I can follow up on Judge Nardini's question just now, that the less the transparency in these circumstances, the easier it is for an American court to recognize the rules of law to which an American court should respectfully defer. Would you agree with that? Or to put it another way, if there's no other particularly authoritative view other than that provided by the Ministry of Commerce, and assume for the argument only that the reason we don't know of any other view is that the system is opaque, it is utterly non-transparent, it seems to me that your position is that it's easier for an American court to understand and to recognize the rules of law to which we as an American court ought to respectfully defer. Well, I think, Judge Kapronis, I understand the question, and the difficulty I have is if you're, you know, pick, let's just make up a country, Xanadu, and Xanadu has no written laws and has no common law rules. All authority rests with a particular agency, and it simply makes decisions. My guess is that, you know, getting a decision out of them as to what Xanadu law means would, you know, you'd sit there and say, well, what am I supposed to do if this is a court? And I don't think transparency helps you one way or the other. You've got a statement, and you're probably going to look at the other considerations to see how much they help you, which is, you know, is the statement that the Xanadu agency gave you, is it the highest agency within the system? Is it thoughtful, clear? Has it consistently taken that position to the extent you can articulate other instances in which the issue may have arisen, et cetera? And the fact that it was not a transparent system seems to me ultimately kind of falls out. The flip side is Xanadu's got a completely U.S. system. It's like Japan or the U.K. You can read all that it has to say. And candidly, to me, you'd be in the same in some ways you might be with what we've got here in China in the Ministry of Commerce. The truth is, you know, U.S. judicial eyes and U.S. lawyers' eyes reading U.K. law, reading, you know, European Commission law or Japanese law and translate it, those things don't, at least in my experience, translate necessarily all that easily, even though those are completely transparent systems. Again, to me, what I would hope is that the court would adopt an approach that's basically intended to encourage the ultimate authorities within these countries to come forward and help the United States courts to understand what the rule of law is in their particular country to assist the courts to get to a correct decision. Now, obviously, that assumes good faith and trust within our global judicial systems. And maybe that's too much to ask for. But I would hope at least in terms of how this court fundamentally approaches these questions, that it would be inclined to defer in the absence of some clear reason to not do so. And in this case, where you have the basis for the statement, the consistency is there. It comes from the highest authorities within the Japanese government. And as Mr. Jacobs has said, it's a coherent presentation of a scheme that makes perfect sense in the context of a country that is trying to transition from a command and control economy into a market-oriented economy without allowing chaos to reign and to do so in a way that will protect it against the risks of, and frankly, serious risks of anti-dumping. I think that's probably a lot more than you wanted for that hypothetical. I apologize. Well, Mr. Phillips, I and Mr. Jacobson, I think are in agreement. The Ministry of Commerce is indeed the highest possible authority on the nature of China law. Is that a fair statement? In the area of trade, it is. Yes, Your Honor. On this question, yeah. And Mr. Jacobson? Absolutely. All right. Yes. So now this is my follow-up question here is perhaps best directed to Mr. Gottlieb, from whom we will hear in a moment. But perhaps you can, Mr. Phillips and Mr. Jacobson can perhaps consider my follow-up question. Are there any, what other known aspects of China law could possibly be relevant to our decision on the nature of China law? Hi, this is Jonathan Jacobson. So I don't think that that issue has been addressed previously in the case, but I have not seen anything to suggest that the materials already in the record or cited on the internet are not sufficient to determine the level of deference to be owed to China's interpretation of its own law. I should add one more thing. So my point, as I said at the outset, is that you really don't even need to reach the issue of deference because the regulations are clear. The one term in the regulations that does require some interpretation is industry self-discipline. The error that the district court committed was assuming that meant voluntary conduct when it means the opposite. It's industry self-discipline, not individual self-discipline. And industry self-discipline means, as the term suggests in context, the gathering together of the participants in the industry to reach a consensus and to discipline their own behavior in connection with that consensus. Once that term is understood, the regulations are completely unambiguous and there's no dispute really as to the meaning of that term. It was stated by our expert, it's stated by the Ministry of Commerce, it's stated in the law review articles that we cite, and it was stated by all the participants in the WTO raw materials proceedings. So that's why I think at the end of the day, as long as you understand industry self-discipline, the case is over. Well, let me go to a somewhat connected question on the question of the clarity, fairness, and support factor. The plaintiffs have charged that the ministry's briefs have offered, and I quote, incomplete, unsupported, and at times misleading interpretations of Chinese law. You remember that argument by the plaintiffs? Vividly. Yeah. So maybe I could ask first of all to Mr. Jacobson, how do you respond to this argument? My view of the world is that, you know, we filed a fairly straightforward brief in 2006 in which we thought in response to the complaint that we would assist the court by providing the views of the Ministry of Commerce and presented the materials that we thought would accurately lay out the reason why the setting of minimum prices in this context was required by the Chinese government. Over time, the litigation, in my mind, has morphed. It's gone through additional proceedings. There was an additional diplomatic statement from the government of China. It goes through summary judgment, and it gets briefed in this court. The precise formulations have changed to some extent, but the bottom line position of the Ministry of Commerce, and so if you're doing it on the basis of the clarity, thoroughness, and support, I would say hasn't changed. Our position in 2006, and as it is in 2021, is exactly the same. The position of the Chinese government was that in 2002, the Ministry of Commerce, through the chambers, required all exporters of vitamin C and other commodities to reach minimum prices. To do so in a way would be demonstrably in violation of recognizing, of course, that they're setting prices for a global market. This is not aimed at the United States. This is aimed to sell goods throughout the world, and to do so at prices that will avoid having the World Trade Organization or its members come and complain that China is a violation of the treaty obligations under the WTO. To me, that is the core of the position we've taken and we've responded to various arguments they've made in various ways that the plaintiffs have put forward and tried to explain, you know, how you can reconcile some language that may seem, at least on its face, to be not as easily recognized. The truth is, once you put it in context and it does all fit comfortably, we didn't do anything, we didn't say anything inconsistent. I mean, to me, that would be the most compelling argument. If we had, in fact, if the ministry literally spoke out two sides of its mouth in different proceedings to serve different purposes, then I would say it'd be hard to make an argument for deference. But in truth, what's happened is the ministry has consistently presented its view as to what was required and the conclusion that follows that what was required is precisely what the right. I think we're going to hear so much about me, but if I just add briefly to that, Judge Cabranes. So the one thing that the plaintiffs say that Mofcom did wrong was cite the 1997 regulation. But Mofcom did that in a context where it's talking about all the regulations in the evolution of the regulatory regime. So there's honestly nothing wrong with that. But to the extent that the judge thought that there were materials that Mofcom should have addressed but didn't, Rule 44.1 provides a mechanism for that. And the advisory committee notes that if the judge finds stuff that he thinks is inconsistent, he should call the people in and ask him for an explanation. And he not only didn't do that, but he didn't even have an argument on summary judge. All right. Thank you. Let's see if unless Judge Wesley or Judge Nardini have- No, I'm good. Thank you. No, no. Thank you. All right. Mr. Godley, you're up. Thank you, Your Honor, and may it please the court. In its 2018 opinion, the Supreme Court held that this court should consider the shortcomings the district court identified in the ministry's position and the district court's careful and thorough treatment of the evidence before it. Following recommendations made by the Solicitor General of the United States in its merits brief urging reversals, the court noted that the materials identified by the district court were relevant not only to the question of deference to the ministry, but to the merits of whether Chinese law required the Chinese seller's conduct. Considering the full record through trial, it is clear that appellants failed to meet their burden to justify dismissal as a matter of comedy. I'm prepared to address all of the questions that the court has raised, but I first want to address two paths by which this court can adjudicate the comedy defense on remand. The first path is that this court can decide the question of what deference is due to the ministry, and if it does, it should decline to defer to the ministry's ultimate legal conclusion regarding compulsion, and it should affirm the district court's careful and thorough consideration of appellant's compulsion arguments. The ministry has now filed five briefs in this case, and its position has evolved substantially since its motion to dismiss brief in 2006. But what has remained constant is the ministry's role in this case. They are less a true advocate than they are a deeply interested... Less a true amicus and more a deeply interested advocate, and their submissions should be evaluated as such. Both the executive branch and the Supreme Court concluded that it was entirely appropriate for the district court in this case to make its own independent judgment under rule 44.1 on the meaning of Chinese law. In making these judgments, courts before and after animal science have refused to defer to foreign government statements that are inaccurate, incomplete, or inconsistent. The ministry's statements here are all three. They are inaccurate because they did misrepresent key provisions of the PVC regime that were operative during the class period. They are incomplete because they failed to interpret key provisions of that regime, and they are inconsistent because they contradicted themselves in their own briefs in this very case. But path two is a narrow way to decide this case, and it does not require this court to decide how much deference the ministries do. In sum, the ministry has now abandoned a critical piece of the interpretation of Chinese law that it offered in its amicus brief in 2006, and its new position, even if this court is inclined to accept it, concedes that it was legally possible for appellants to comply with the PVC regime in the Sherman Act. In 2006, the ministry's amicus brief to the district court argued that throughout the class period, exporters were compelled to be members of the vitamin C subcommittee, that the subcommittee in turn was required to formulate the export price, and that no one could export vitamin C if they failed to participate in these price-setting activities. Indeed, the ministry's 2006 brief claimed that appellant participation in subcommittee price setting was mandatory, and that if they refused to participate, it could result in the loss of ability to participate in the industry altogether. All of those representations were based upon repealed provisions in the 1997 notice for the 1997 charter. But today, the ministry's position in a three-man brief is different. The ministry has admitted that during the class period, membership in the vitamin C subcommittee was a choice, and non-members had the right to export. It was subject only to the requirement of submitting their proposed export contract to the chamber. This appears at page five of the ministry's brief on remand. The ministry has also admitted that any submitted contract whose price exceeded the price floor would have received a chop. Thus, the ministry's interpretation of Chinese law is that it was indeed possible for any manufacturer to export vitamin C to the United States without participating in price-setting activities. That interpretation is not theoretical, and it is not nonsensical. It took place. We know this because of the testimony that occurred during the trial, including of defendant star witness Chow Hai-Li. We also know this because of the of the pre-trial materials and affidavit submitted by Chow Hai-Li, including his pre-trial affidavit, which is at pages 693 to 694 of the appendix, in which he conceded that many of the Chinese exporter, including many of the original defendants in this case, never participated at all in any of the chamber's official price-setting meetings. And so we have four arguments as to why there was no true conflict. In other words, why compliance with the Sherman Act was possible for the appellants in this case, which is all we have to prove in order to sustain the verdict below. The first is that participation in the subcommittee was optional, as just explained. The second was that the PVC system did not legally compel the adoption of price agreements, as I will explain. The third is that the suspension provision made compliance legally possible. And the fourth is that departures from the price floor were not mandatory. Let me pause on this argument for a moment. The ministry's position is that the PVC regime operated as a mandatory price floor. Appellants and the ministry admitted below repeatedly that the only PVC price throughout the class period was $3.35 price floor. Appellants, however, frequently reached price agreements above that floor, and none of those agreements was ever submitted for PVC enforcement because the chop was always keyed to the $3.35 price. All of these agreements north of the $3.35 price violated the Sherman Act. None of these agreements were required by the PVC regime. Thus, there is no conflict with Chinese law to have relief entered on the basis of these agreements. Now, appellants' only answer to this is to say that because they were required to agree on a price floor, none of their later conduct matters because they had already violated the Sherman Act. But as a legal and factual matter, appellants could have opted out of membership in the subcommittee and avoided participating in meetings and avoided participating in setting the price floor. Sending in contracts for the price verification and chop review would have complied with the Sherman Act. Even if you disagree with that and believe that appellants were compelled to participate in setting the $3.35 price, that participation did not violate the Sherman Act under appellants' own cases cited at page 31 of their opening brief describing the compulsion defense. Under those cases, if one believes that appellants were compelled to set the price floor, they could have complied with the Sherman Act by doing no more than what the government compelled them to do. Cases like Saucony Vacuum and Plymouth Dealers Association do not hold otherwise because they do not involve government compulsion that required for Sherman Act violations. But appellants did not do that. Appellants repeatedly reached agreements above the $3.35 price floor. Those agreements were not compelled, they were not submitted for PVC enforcement, they were not embraced by the chamber of the subcommittee, and they included prices between $9 per kilogram, $11.50 per kilogram, as we lay out in footnote eight of our remand brief. These agreements made up the bulk of the damages case in this case, and as this case was tried to the jury, particularly in our closing argument, it focused on agreements above the price floor as being key to the jury's finding in the case. Let me return to the record evidence and the materials relating to demonstrating why participating in the price-setting aspects of the PVC regime was voluntary as of 2002. It's crystal clear from the 2002 charter that membership in the vitamin C subcommittee throughout the relevant period in the class was a choice. The ministry agrees with that, appellants agree with that. The ministry admits that membership was a choice and that the only requirement of the regime was that the chamber give non-members the, quote, same treatment as other members. Appellants have also admitted this at pages three through four of their remand brief, and this was what the district court expressly relied on in its summary judgment holding, which appears at pages 45 and 46 and 88 through 92 of the appendix. Non-members who opted out were not required to participate in any price-setting activities. They were only required to submit their contract to the chamber for a chop. That gave non-members a complete process by which to export vitamin C to the United States without violating the Sherman Act, because the ministry's letter brief admits that any contract above the price floor would have been accepted and chopped. The shift in penalties from 1997 to 2002 reinforces this. In 1997, the penalty for violating chamber directives included suspending and even canceling vitamin C export rights. The only permissible penalties under the 2002 charter was issuing a warning or suspending or canceling membership in the subcommittee. Now, appellants say that they couldn't have quit because they were appointed to four-year terms, and they point out that no one ever quit under these provisions. There's a number of problems with this argument. The first is that they never made this argument in the district court at any stage. They didn't rate it in their summary judgment motion. They didn't rate it in their Rule 50 brief. They didn't argue it at trial. The other problem is the only authorities that appellants have for this proposition is the pretrial affidavit of Chau Haile. It's interesting that they cite to the pretrial affidavit because Chau Haile testified at trial, and he was asked directly about this issue on cross-examination, admitting that the 2002 charter, unlike the 1997 charter, quote, provides for the freedom to withdraw from the subcommittee. He said nothing on cross or redirect about appellants not being able to exercise that right based on four-year terms or otherwise. That wasn't argued at trial. It wasn't argued in an appellant's brief, and the district court could not have erred in not crediting an argument that was not presented to it. On the merits of the argument, the ministry has never embraced this interpretation of the charter, not once in any of its briefs. Only appellants have. And the text of the charter is contrary to it. Article 16.8 of the charter on its base gave subcommittee members the right to, quote, freely resign. It doesn't say anything about resignation being possible at the end of the term. And Article 18 lays out the process for resignation. And nothing in Article 18 says or even remotely suggests that these provisions couldn't be invoked during an appellant's four-year terms. But finally, even if you are inclined to credit the testimony from the affidavit that the appellants have cited, the only testimony that has been provided is Chau Haile's personal belief that it was not practical for companies to resign for the subcommittee. That is not the law. The law is whether it was legally possible for them to comply with both regimes, and if they could have resigned, even if it was not practical, even if you were to credit this, it was still legally possible for them to do so. In any event, as I've mentioned earlier in this argument, the affidavit isn't even internally consistent because earlier at page 693, Mr. Chau directly admits that many of the original defendants in the case never participated in the coordination meetings. Turning to our second argument that price fixing was optional, it was just a system to enforce the price agreements, we have a few points. The first is that the record materials is clear on this point. Again, Chau Haile, who was their star witness at trial, testified, and this is at pages 1821 to 1822 of the record, that it was, quote, perfectly fine for the members to agree that there would be no minimum price. He conceded that appellants had the ability to make that decision based on, quote, market conditions. They've described this system as nonsensical. They've described the system as one that we have fabricated or made up, but their own witness under oath at trial said that if the appellants had not agreed to prices, it would have been perfectly fine and that there wouldn't have had to have been a minimum price. That view is corroborated by documents that came out in the case, including undisputed evidence that there was no minimum price in place during key periods of the class, including during 2003. That material is cited at page 12 of our brief in 2014, and also the trial record showed that companies regularly submitted contracts below the PVC price, and while there are many examples of such contracts receiving chops during the class period, appellants did not provide a single documented example of a chop being denied to a below floor price. Apart from the record, the text of the regulatory regimes confirmed this understanding. None of the authorities cited by the Ministry of Appellants, whether it is the 2003 announcement or the 2002 PVC notice, say anything about a price agreement being mandatory. They simply discussed coordination, sharing of information, and the need to follow agreements and implement agreements once reached. But the shift from the 1997 charter to the 2002 charter is illustrative. That shift removed six separate references to price setting requirements that existed in 1997. That said that the subcommittee shall coordinate and administer market and price, gone in the 2002 charter. Article 10, which in 1997 said that the subcommittee shall hold working meetings for exports to analyze and work out coordinated prices, gone in 2002. Article 15.6, which in 1997 required strictly executing export coordinated prices set by the chamber, gone in 2002. And was to discuss and set export coordinated price, also gone in 2002. None of the provisions cited by the Ministry of Appellants explains why this function remained in place or what the purpose of any of these changes to the regime would have been if not for to create the ability to reach price agreement, even to encourage them, but not legally compel and require them. Excuse me, you have a minute left. Thank you. Appellants have argued that this interpretation is nonsensical, but that is not true. It is, first of all, the system that was described in the documents produced in the case by the testimony at trial, and it made perfect sense to set up a system to enforce price fixing agreements and even to encourage them and incent them and to demand that businesses share information with the chamber when they had reached the agreements. But what makes no sense is to compulsion reach price agreements in the first instance, particularly in the context of a regime purportedly built upon self-restraint. One point about self-restraint that was mentioned by Mr. Jacobson, Mr. Jacobson said everyone has agreed that self-restraint was a reference to price fixing. That is not true. As a district court's opinion on summary judgment noted at footnote 17 on page SPA 55, the definitions of self-restraint and self-discipline offered by both the ministry and Professor Shen are circular and inherently circular because they refer back to the requirements of Chinese law, thus requiring the district court to analyze what the requirements of Chinese law were in the first instance. With that, I believe my time has likely expired, so I'm happy to answer the panel's questions. Thank you very much, Mr. Gottlieb. Wesley, any questions? Yeah. Mr. Gottlieb, what do you make of the WTO representations? I take it it's not really cornerstone to the argument you're making here. How do you make sense of the November documents from the WTO that the district court jumped on with regard to the withdrawal of export administration by China with regard to vitamin C? Your opponents say, well, that was in the context of the government itself, but didn't relate to the fact that they had replaced it with this industry self-restraint kind of idea. What do you make of that? Thank you, Your Honor. I think the first thing I would point out is that the only factor in animal science this is relevant to is the question of consistency. On that factor, we would argue that it's far more important here that if you just line up the ministry's briefs 2006 to the one that they've filed on remand, they're inconsistent on the core legal issue in the case. That is far more important than whether there was inconsistency with the statement to the WTO. On the merits of the statement, I would say a few things. First of all, the solicitor general's brief on the merits in the Supreme Court is quite helpful on this. They addressed this argument at footnote 7, page 31 of their brief on the merits. They explained that this was a legal standard. The WTO standard is where the actions were attributable to the government, which is a different legal standard than the impossibility standard under the comedy doctrine. They explained that it was a different record and that materials, including, for example, materials relating to the 2002 PVC regime that were in the record in this case were not before the WTO. The United States rejected Mr. Jacobson's characterization of its position. I would commend the court to look at that footnote by the U.S. government. But also, as we pointed out in our remand brief, it's impossible to determine China's consistency in these two proceedings because China's submissions are not publicly available. So without their publicly available materials, we can't know whether they were taking the consistent position. But as we point out in footnote 7 of our remand brief, there's really good reason to believe that China took positions in that proceeding and consistent, including this quote that we provided footnote 7, that China was arguing that evidence showing exports of yellow phosphorus occurring below the minimum export price demonstrates that China did not maintain a minimum export price requirement. So on the merits, even, we think that there's not much here. The last point I would make about the WTO argument is that the district court's comparison of the WTO standard was against the ministry's legal regime that it offered in its 2006 brief. But the ministry was arguing in its 2006 brief that membership in the subcommittee was mandatory and that if you didn't participate in the subcommittee, you couldn't export. That was very similar to a licensing regime. The only way you could export was by participating in the committee. The ministry didn't cite the 2002 charter. It didn't explain that participation in the subcommittee was now voluntary. And so the distinction that the very different description of the Chinese legal system that wasn't provided to the district court. Okay, thank you very much. Judge Nardini. Mr. Gottlieb, can I ask you to address the question that I asked your opponents, which was, what do you generally make of the transparency requirement? When does that cut in favor of transparent? I think your honor hit on the difficulty here, which is that in some circumstances, it can argue for more deference and in others, it can argue for less. What I would say is that in circumstances where you have a less transparent legal system, that is going to make some of the other factors much more important, particularly context, clarity, and consistency and thoroughness. So why is that? If the system is less transparent and we don't have the typical sources that we're used to consulting, whether it's regulatory materials, legislative history, common law, development of cases in a judicial system, you're going to need the position laid out in a way that is thorough, in a way that is clear, in a way that directly interprets the legal positions in this case. It's less useful to have circular definitions of things like self-discipline and restraint, like we have in this case. And I think context is going to be particularly important when you have a less transparent legal system, because in a less transparent legal system, as your honor has pointed out, you're more nervous about just deferring to a position, particularly when it's a position that isn't anchored in some prior statement. And so this particular position that's been offered was offered in the context of this litigation, in the context of a joint defense agreement, suffering from the problems that I've laid out at the top of the argument. And I think in that context, when you have a less transparent legal system, it makes it all the more important to ensure, if you're going to defer to the position, did they actually interpret the legal position at issue? Did they actually cite the places where they've made this argument before? And in this type of situation, it might be relevant, have they penalized companies in the past for, or companies in the past for simply declining to reach agreement? These types of inquiries will be really important, but not available for the court here. And at least as to the first of the considerations that the Supreme Court lined up, would you agree that the ministry is in fact the highest authority in China that would be in a position to offer an opinion about this, about these particular policies? I know that that doesn't necessarily mean all of the factors together necessarily cut one way or the other, but at least in terms of the authority of the ministry, do you agree that they're the highest? We don't dispute that the ministry is the highest authority to regulate foreign trade. The argument that we have made is similar to the one your honor was asking in the question to counsel for the ministry, which is the argument that that doesn't mean that the ministry has the authority to interpret law through arguments made in an amicus brief. And there are of course analogous contexts to this in U.S. administrative law context. But the point that I think your honor made about the process, whether one calls it notice and comment rulemaking or otherwise, is that Chinese law does recognize a process by which law is interpreted. And it's quite clear from the materials appended to the ministry's brief that simply saying so in the context of an amicus brief doesn't get you there. Well, but I guess just to play the devil's there's nothing in the record suggesting that they have somehow exceeded their authority under Chinese law, right? We have no idea what internal deliberations the Chinese government went through before sending their brief to us, right? Well, we do. And the ministry submitted a statement in 2008 which reaffirmed the 2006 amicus brief. That statement in 2008 represented that, and this may cut against us on the question of authority, but I think cuts in our favor on the question of context and consistency. But the representation in the 2008 statement is that the ministry reviewed the 2006 brief, which we have described as misleading and inaccurate, at the highest levels of government and reviewed it word for word. So they have embraced it. We don't dispute that it's embraced and endorsed by the Chinese government. Our dispute is whether it is worthy of some type of deference that would cause the court not to make its own independent inquiry under rule 44.1 because certain assertions are made in the amicus brief. Okay. So let me turn to the argument that you were making and that I tried to explore with opposing counsel about your distinction between the setting of a minimum price is $3.35 a kilogram. And first of all, let me just make sure I'm characterizing your argument correctly. So I'm understanding you to argue on this particular point that even if one agrees that the Chinese government compelled the exporters through the chamber to come up with a minimum export price of $3.35, well, what turned out to be $3.35, what the chamber settled on, and that that number was enforced through the price verification and CHOP program, that the Chinese government did not, however, compel the exporters to collude or coordinate higher prices, which by and large, they generally charge. And to the extent that that additional activity was not compelled by the Chinese government, it is not immune from the Sherman Act. So let me just start there. Am I characterizing your argument correctly? And if not, please, please flesh that out for me. Yeah, you're right. I believe that you are characterizing it correctly. Our position is that obviously we dispute that the defendants were required to reach even the price floor, but assuming for sake of argument that they were, we accept the representation that there was only one price floor throughout the class period of $3.35. And so the question then becomes, are agreements that were reached, which were proved to the jury, proved to the jury that agreements were reached above that price floor actionable under the Sherman Act. And remember, we're applying in this context, the Hartford Fire comedy test of legal impossibility of compliance with the laws of both. And the reason that $3.35 floor was compelled is because participating in the setting of that floor and enforcing that floor, if it was compelled, does not violate the Sherman Act. If it was compelled, it doesn't violate the Sherman Act. This is their entire defense in the case. Where it violates the Sherman Act is where they act outside of the compulsion. And the reason that you know that it has to be correct, that Mr. Jacobson's argument is wrong, is because if his argument was right, it would mean that every government in the world could just set a one penny price floor for all of its products. And then all of their businesses would be compelled to engage in price fixing. They could never be held liable in the United States. Now, while that principle may seem far fetched, the argument runs in a similar way for what happened in this case, which is that you had a $3.35 anti-dumping floor, as the defendants have alleged it. But the defendants repeatedly got together outside of chamber settings in the systems not enforced by the PVC and reached agreements. It cannot be the Chinese law required them to reach those agreements because they already had the floor. And if they were required to reach those agreements, then it would lead you to this absurd world where every day before they agreed to $9.50 as the price, they were violating Chinese law because they hadn't agreed to $9.50. It doesn't make any sense. But again, to explore this, it's my understanding that, and your opponents can correct this on their rebuttal, that they're arguing that, yes, the exporters were required to have a minimum price. And that was what was enforced through the PVC program. But they also had this much broader obligation that was put in these broad terms in the 2002 notice. For example, things like they must promote industry self-discipline. And if you accept their argument that industry self-discipline is a broader obligation, just because part of the obligation was setting a minimum price, they should also be doing things to, I guess, at the risk of oversimplifying, stabilize the export market, monitor their volumes of export, confer about prices. And even if they didn't require them to choose a particular price, the minimum would go every single day, it would go up and down, up and down. They could have a floor and then they would have to consult liberally about everything else. I mean, isn't that another possible reading? I understand that's not the reading that you subscribe to, but I mean, wouldn't that still arguably create a situation of foreign compulsion? It certainly wouldn't create the situation of foreign compulsion. So we're talking about two different legal doctrines. So under the doctrine of foreign sovereign compulsion, they're miles away from establishing that based on those facts, because foreign sovereign compulsion is not available if the defendant could legally have or refused to accede to the foreign power's wishes. That's the Mannington Mills case from the third circuit. There's no question that they didn't have to adopt these higher price floors. It's just that they did not have to, they could have not participated in it. But also it only arises, as we've cited from the DOJ's guidelines, in context where a refusal to comply with foreign government's command would give rise to the imposition of penal or other sanctions. And it's in this context that the district court's analysis of enforcement of the regime was entirely appropriate. It's entirely appropriate in a foreign sovereign compulsion context to examine the question of whether enforcement is taking place. The Justice Department looks at that very carefully in these cases, and courts have as well. But then in the comedy doctrine application, what I would say is, remember, you're applying an abuse of discretion standard, reviewing a decision from the district court, under which the legal question is whether compliance with both regimes was impossible. And the defendant's explanation and the ministry's explanation of self-discipline begins to bleed over from Chinese law and an interpretation of Chinese law into US law's impossibility means. And they are not entitled to dictate how this court interprets impossibility, which is set down from the Supreme Court's decision in Hartford Fire and other decisions from this court interpreting it. And the fact that they were encouraged through the system of self-discipline, incentivized, that they were even pushed and prodded to reach other agreements in potential future government regulation does not mean that they were forced to, and it doesn't mean when they sat down to reach the $9.50 price agreement, if they hadn't have reached that agreement, they wouldn't have violated Chinese law. And that's the question that Hartford Fire asks. Okay. And so just so I understand, one of the distinctions between your argument regarding the $3.35 minimum price and the coordination of fire prices, I think what you were saying, and tell me if I'm wrong, is that you're saying that even if one assumes that foreign sovereign compulsion could have covered the setting of the $3.35, and I know you don't concede that, but assuming it did, it would do so only because there was what, the PVC enforcement mechanism, but there was no other enforcement mechanism in place for this more amorphous general coordination practice as to higher prices. And for the foreign sovereign compulsion defense in particular, American law requires that demonstration of a clear demonstrable sanctions regime. Is that fair? Am I saying that right? Yeah, I think so, Your Honor. I think the way I would think about it is, assuming their argument is correct, the way you know that the $3.35 price was part of the Chinese legal and regulatory system is because that was the price that they allegedly used to monitor the chop. And one of the requirements of the PVC regulatory regime, as the ministry has described it, is you businesses have to get together, you have to set a price. Again, I'm not conceding this, this is the way they've described it. You businesses get together, you have to set a price, and then you have to report it to us, and then we're going to enforce it by testing each contract and giving ones above the price for a chop. The reason that you know that all these other agreements weren't part of the system is because they were never reported. They were never reported to the chamber, they were never enforced, they were never, those prices were never used as the price for measuring whether a contract could get a chop or not. And the defendants in the ministry have admitted that. So those agreements could only be compelled if you thought there was some sort of freestanding concept from the notion of self discipline, that every time these companies got together and acted and talked to each other, they were doing so, you know, functionally as arms of the state. And that is not what these authorities state. That is not consistent with the notion that companies could have opted out of the regime. It is not consistent with the way people like Chau Haile described the system when they testified under oath at trial. And it's just not consistent with the way that the system operated with the materials that we put forward both in discovery and a trial. Okay, that's very helpful. Thank you very much. Okay. Mr. Gottlieb, before we ask Mr. Jacobson to take advantage of his remaining three minutes, I have a question or two, but a very basic question, procedural concern that I have. And I asked this question without intimating any view in favor of extending these proceedings any further. You seek, obviously, a favorable termination of this case, right? Correct. So is this court, the Court of Appeals, now in a position to enter a final judgment based on the record before us? To put it another way, given the state of the record, is it possible for this court to enter a decree that conclusively decides this case? Or to put it in another way, are these questions, are there questions of fact lurking here that must yet be considered or reconsidered by a trier of fact? Your Honor, there is a jury verdict in this case and a Rule 50 opinion from the district court below that considered and adjudicated the three and only three issues that the defendant raised after trial. That motion is properly before this court. And this court's only task under cases that have been decided recently, including the Omega case that we cited in our 28th J letter, is to adjudicate and decide those properly preserved Rule 50 issues from appeal. The court has all of the tools it needs available to it, including a robust record from trial, including five different submissions from the ministry attaching and appending voluminous materials on Chinese law, and more. And I think one of the reasons that I was trying to explain that I don't think the court needs to wade in necessarily to the question of what standard of deference to give is because I think that the ministry's evolution of positions in this case makes it reasonably simple for the court to resolve the legal issue before it. All right. I think I've got your argument. And maybe Mr. Jacobson can begin his rebuttal by answering my same question that I put to Mr. Gottlieb. Well, Your Honor, you, in an argue, should reverse the judgment outright based on a lack of subject matter jurisdiction for failure to abstain on doctrine of international comedy. And that would finally resolve the case. In terms of the plaintiff's arguments, there are a number of arguments that we raise in our brief and reply brief that we haven't talked about today and that you would have to consider before affirming the judgment. I would like to take the balance of my time to address a few of Mr. Gottlieb's arguments. First, he says that a number of the 1997 provisions were gone in 2002. And those that related to export administration, i.e. quotas and licenses, were gone. But Article VII, the subcommittee shall coordinate and administrate market price, etc. That was simply restated in the 2002 charter at 3929 of the joint appendix. Same thing with Article X, same thing with Article XV. And so Mr. Gottlieb's statement that the 1997 provisions were gone in 2002 is just not accurate. Second, much of Mr. Gottlieb's argument, although he acknowledged the difference later on, but most of his argument confuses foreign sovereign compulsion with comedy. Under comedy, what we have to show is that the laws conflict, that there is a conflict in the laws, not the administration of the laws, but the laws. That was what this court held in its prior opinion. And then finally, we've heard lots about prices in excess of the minimum price. First of all, the other prices had to be reported to Customs. Customs had to receive the industry negotiated price on all the exports. The difficulty is that discovery was not taken from the Customs. And therefore, the number of chopped contracts in the record, which would reside at Customs, is quite small. And then finally, Your Honor, all the stuff about charging over at minimum price, this court addressed that thoroughly in its prior opinion. And I'll read from page 192 and then I'll close. It says, inquiring into whether the Chinese government actually enforced the PVCA regime as applied to vitamin C exports confuses the question of what Chinese law required with whether the vitamin C regulations were enforced. The court goes on to say the District Court made a conceptual error about the potential difference between foreign compulsion and a true conflict. The District Court credited plaintiffs' arguments that because there was evidence that defendants routinely agreed to export vitamin C at prices well above the agreed upon minimum of $3.35 per kilogram, the defendant's alleged anti-competitive conduct was not compelled. But this conclusion misses the mark. Even if defendant's specific conduct was not compelled by the 2002 notice, that type of compulsion is not required for us to find a true conflict between the laws of the two sides. And, uh, are you saying, are you saying, excuse me, Mr. Gallagher, I apologize, Judge Wesley. Are you saying the Chinese law required agreements on whatever the price was? There's a minimum that's set, but any price, any contract that's entered in which there's a price that's extended or a group of contracts that are entered that are above the minimum, that the Chinese law required the charter of the committee to approve that or to, to, to agree to that? It required the subcommittee and its members to coordinate on prices, which in this country is prices required coordination on all the prices. Can I follow up on, on Judge Wesley's question? And I'd like to do it in terms of Judge Wesley's. I understand you were trying to rephrase it, presumably in the terms used by the Chinese, but, um, in your view, then did that mean that any time an exporter was going to export vitamin C, they had to do it at a specifically coordinated price that had been agreed upon by the chamber? Yes, your honor. And that is, uh, specifically what the regulations required. I'm trying to have the specific, uh, page and passage. You can send us that if you want. All right. So if Judge Cabrera says it's all right, Judge Cabrera has to say it's okay. If you've got a page. I have it in front of me, uh, your honor. And so at, at 3950, uh, members would be punished for that, uh, in the 2002, uh, administrative rules for, for the subcommittee. There's another passage. If I could just jump in, I guess I was interested in not just finding out the punishment for not carrying out the agreement, but where does it indicate that by agreement, what they mean is not minimum price, but that any price that you want to sell out must be agreed by the group. That's what I'm looking for. And if it's in ministry submissions, you could, you could send a letter afterwards too. That's fine. Um, it, it, it's really not. It's that the regulations required price coordination, nothing in the regulations required coordination at a specific price precisely because the whole concept was to delegate to the members, the obligation to fix the price. And I guess what I'm trying to get at, and I appreciate the indulgence of our presider here is that those higher prices were not monitored by PVC, correct? Or are you saying they were transmitted to customs, but we have nothing about it in the record indicating that it was transmitted to customs. I'm just trying to understand what was PVC monitoring, any of the prices or just the minimum 335. The chamber was required to fix a chop. If the agreements complied with the industry green, there is no price stated in that connection, but there is the requirement that each contract comply with the industry agree. So your view is that the chop would be given in, in, not for three 35 throughout this period. And I understand it wasn't the government that came up at three 35 at the chamber, the exporters acting in concert. Um, and your view is at the direction of the government, but your view is then the chop would be given at various different prices. The chop point where the chat verification price would vary over time. It was not a consistent three 35. Is that what you're saying? So the record is entirely unclear at that point. I'm just going on the basis of what the regulations clearly say, which is how this court analyzed the regulations in its prior. I'm not going beyond that. Okay. Okay. Okay. Great. Thank you very much. I think we've exhausted our arguments, but if either of my colleagues has any further questions, uh, no, no, thank you. Good. Thank you. Yeah. Okay. All right. We'll reserve decision. And I asked the courtroom deputy to close court to adjourn. Of course.